### DILLON *v.* BARNARD ET AL

1. A demurrer to a bill in equity does not admit the correctness of averments as to the meaning of an instrument set forth in or annexed to the bill.
2. To create, for future services of a contractor, a lien upon particular funds of his employer, there must be not only the express promise of the employer to apply them in payment of such services, upon which the contractor relies, but there must be some act of appropriation on the part of the employer relinquishing control of the funds, and conferring upon the contractor the right to have them thus applied when the services are rendered.
3. In an indenture of mortgage executed by a railroad corporation to trustees to secure bonds issued to raise moneys to pay off its existing indebtedness, and to complete and equip its road, the corporation covenanted with the trustees, among other things, that the expenditure of all sums of money realized from the sale of the bonds should be made with the approval of at least one of the trustees, and that his assent in writing should be necessary to all contracts made by the company before the same should be a charge upon any of the sums received from such sales; *held*, that a contractor, agreeing with the corporation to construct a portion of the road, and obtaining the assent of two of the trustees to his contract, and subsequently doing the work, did not acquire any lien for the payment of his work, under this covenant of the indenture, upon the funds received by the corporation from the bonds.

APPEAL from the Circuit Court for the District of Massachusetts; the case being thus:

The Boston, Hartford, and Erie Railroad Company, a corporation existing under the laws of Massachusetts, Rhode Island, Connecticut, and New York, and having a railway (then partially constructed and subject to certain mortgages and other liens) between certain points in those States, on the 19th of March, 1866, by its indenture of mortgage of that date, conveyed to Berdell and others all its railways, rights, leases, privileges, and franchises, and all its property then owned or thereafter to be acquired, to be held by them and their successors in trust upon the terms and for the purposes set forth in the indenture. The object of its execution was to secure certain bonds of the company, in sums of $1000 each, to the amount of $20,000,000, to be thereafter

issued and disposed of to raise the funds required to provide for and retire all the then existing mortgage debts and prior liens upon the line of its road, and to complete and equip the road, and to lay down a third rail thereon. The road in its then existing state was of less value than the amount of the bonds proposed to be issued. The company, however, expected that, upon its completion, the road would be of great value and afford ample security for the bonds.

The indenture provided that the mortgage should *be the first and only lien on the property and franchises of the company* when the existing mortgage debt was retired, and it contained the following covenants on the part of the company:

"1st. That of the bonds issued there shall be retained in the hands of the trustees such portion as will be equal to the whole amount of the bonds and mortgage notes outstanding from time to time, as a lien upon any of the property or franchises conveyed, to be delivered to the company only on the cancellation of a corresponding amount of such outstanding bonds or mortgage notes; and,

"2d. That the expenditure of all sums of money realized from the sale of the bonds shall be made with the approval of at least one of the trustees, whose assent in writing shall be necessary to all contracts made by the company before the same shall be a charge upon any of the sums received from such sales."

In October, 1867, one Dillon entered into a contract with the corporation for the construction of a portion of its railroad at certain specified rates of compensation, the work to be commenced on the 1st of December, 1867, and completed on the 1st of June, 1869; payments to be made monthly of 90 per cent. of the work done, as estimated by the engineer of the company, the remaining 10 per cent. to be retained until the completion of the work. *This contract was approved and assented to in writing by two of the trustees under the mortgage.*

After the work was done, but before the time fixed for payment for it came round, the company became bankrupt and had no property from which payment could be got, except such as was then claimed under the mortgage and was now held by the trustees under it; certain persons who had

been substituted in the place of the original trustees. Assignees in bankruptcy having been appointed, Dillon accordingly filed a bill in the court below against the trustees and the assignees to get payment of what the company owed him.

The bill, having set forth the facts already mentioned, alleged that the railroad was at the time of the mortgage of small value, because not completed; and alleged further that the better to attain the objects of the mortgage, namely, the acquisition of funds and the construction of the unbuilt portions of the road, and in order to induce other persons to enter into contracts for the construction and completion of the road, the agreement contained in the second or last abovementioned provision was made; and that such agreement was a part of the terms and trust under which the trustees held and were to hold the trust estate; and that according to such agreement they and the corporation bound themselves and their successors to act; and that the contracts of the corporation assented to in writing by one of the trustees should and would be *a charge* upon the sums realized from the sale of the bonds issued. A copy of the indenture of mortgage and of the contract with the plaintiff was annexed to the bill.

The bill, referring now more specifically to the particular contract of Dillon, further alleged that *the purpose, object, intention, and understanding of the parties*—the corporation, the trustees, and the complainant—in procuring the approval of the trustees in making the same, and in accepting the contract so approved, was that the sums to become due to the complainant under the contract should be a charge upon the sums to be received from the sales of the bonds, no part of which, or a very inconsiderable part of which, had then been sold or disposed of; that the complainant thereafter undertook and performed work under his contract; and thereunder expended large sums of money, relying for his compensation on the sums of money to be derived from the sales of bonds, and his lien thereon *by virtue of the premises* as aforesaid; and that *his reliance thereon was at all times well known to the corporation and to the trustees under the mortgage;* that the work done

under the contract was accepted by the engineer of the company in charge, but for only a portion of the amount owing to him was the complainant paid; and that there remained due to him for this work over one million of dollars, with interest from the 1st of January, 1870.

It alleged further that a large amount of money was received by the company from the sales of the bonds issued, more than sufficient to pay the amount due the complainant, but that instead of being thus appropriated, it was expended in acquiring new property, to be held under the mortgage, and in improving and increasing the value of the property then and since in the possession of the trustees.

It alleged in addition that the amounts due to the complainant became and were a charge and lien upon the money derived from the sale of the bonds; that the money thus raised became appropriated to, and ought to have been used and paid to discharge the debt to the complainant and to no other purpose; that it was within the power of the trustees and of the corporation to cause the same to be devoted to that purpose, and to prevent the same from being devoted to any other purpose; that by virtue of the premises the trustees and the corporation became bound to the complainant so to do, and became trustees for his benefit for that purpose, under said indenture and agreement; that the trustees and corporation wrongfully permitted and suffered the money which ought to have been paid to the complainant to be otherwise expended, to an amount exceeding the amount due to the complainant; and that at the present time, and on March 18th, 1871, and on October 21st, 1870, and long prior thereto, the plaintiff "had a valid and subsisting lien on the said property and franchises of said corporation, arising from and created" by the facts and proceedings set forth.

The bill prayed that the defendants might be declared trustees for the benefit of the complainant of the property held by them under the indenture, to the extent of the amount of money and interest thereon which was due to the complainant and wrongfully expended in acquiring and im-

proving and adding value to said property ; and trustees for the benefit of the complainant of so much of the property, and of the value in the hands of the trustees, as was acquired by and as is due to such wrongful expenditure, and for general relief.

To the bill the defendants demurred generally for want of equity. The Circuit Court sustained the demurrer and dismissed the bill, and the case is brought to this court on appeal.

*Messrs. S. Bartlett and J. J. Storrow, for the appellant.*

1. We have in the outset of this case, the distinct admission of the defence, that whatsoever may be the legal construction of the second covenant, it was the " understanding, purpose, and object of all parties," that the plaintiff should and did have a lien or charge upon the proceeds of the bonds.

.. If the construction of the covenant is doubtful, then the confessed contemporaneous construction of all parties, and the grave acts of the plaintiff admitted to have been done under that construction, and to have been known to the defendants to have been so done, will tend to remove the doubt.*

2. What is the true legal construction of the covenant?

An inspection of the mortgage shows that it was framed in complete distrust of the fidelity of a faltering corporation, and that all the bonds, and their proceeds, embraced in the mortgage, were designedly placed in trust.

3. Then by a just construction of the words of the trust contained in the second covenant, were parties making written contracts to construct and equip the road intended both by the company and the trustees, on compliance with its terms, to be secured by it? It is admitted by the demurrer that the case is one of a corporation with an unfinished road of small value in itself, and in addition deeply

---

* Noonan *v.* Bradley, 9 Wallace, 407 ; Railroad Company *v.* Trimble, 10 Id. 377 ; Stone *v.* Clark, 1 Metcalf, 381 ; Livingston *v.* Ten Broeck, 16 Johnson, 22.

mortgaged, destitute of means to make such completion, and thus clearly with no credit, proposing a new mortgage of $20,000,000, which would have priority to any claims of contractors. How do these circumstances weigh upon the construction of a provision in the mortgage (should the terms of that provision appear doubtful), whether there was an intent to provide, out of the sales of the new bonds, security for any one who would venture to contract to complete the road? Do they not tend to support the allegation of the bill, that the clause was inserted in order " to induce other persons to enter into contracts for the construction and completion of said railroad," which allegation the demurrer admits?

4. Next, as to the legal construction of the article itself, or the clause in the mortgage on which the controversy arises.

There is nothing in the surrounding circumstances, in the terms, recital, or scheme of the mortgage, which tends to the conclusion that the language of the second covenant was inadvertently used. If this is so, then the words must receive their natural force and meaning, and the construction must be such that every word used by the parties shall be made effective. It is then clear that the article contemplates " *a charge*" in favor of some person " *upon* the sums received," whensoever contracts of the description referred to shall be made and approved in writing by the trustees.

Who then are the person or persons in whose favor that charge was to arise?

The language rightly construed cannot import the creation of a charge in favor of the corporation itself. *It* already held the funds in its own hands in trust for the same purpose, with the right and duty so to apply them. The character of the charge to be created points conclusively to the parties for whose benefit it is created. That charge is to be of the " *contract made*," not merely of the fixed periodical payments to be made under it. None but a contractor would have any interest in having the *contract* itself made a charge upon the fund.

The bill avers that the plaintiff acted with full knowledge

of the clause authorizing, as we assert, a charge of his con-
tract on the fund, and was known by the defendants to have
so acted, and to have expended his labor and means on the
faith of it. This the demurrer must be deemed to admit.

Why was the approval of the trustees procured, made, and
accepted by these two parties and the complainant? Upon
the theory that it gave him no charge upon the fund, it was
an idle and a purposeless act. There was already the valid
contract of the corporation. Upon the defendants' theory
the written approval of the trustees gave him nothing more,
and why did the trustees go through the formality of making
a written approval which they knew or supposed gave no
additional force to the contract or security to the contractor?

The acts of both the complainant and the trustees were
obviously in compliance with the second covenant, and it
thus follows that it was known to the former; and further,
that the trustees, when the contract was presented to them
for their written approval, knew and understood that the
contractor had a motive for procuring that approval, and
that that motive was to give him some advantage or security
which he would not possess without it.

Can the trustees or the company be heard to say that they
did not understand that this advantage and this security
were a charge upon the trust fund under the second cove-
nant?

Finally, the provisions of the indenture coupled with the
written approval of the contract in pursuance of them, give
to the trust relied on that certainty of subject and of object
which is necessary to its enforcement, and which of itself is
deemed to be ground for inferring the existence of a trust
from words doubtful in themselves.[*]

*Messrs. C. S. Bradley and W. G. Russell, contra.*

Mr. Justice FIELD, after stating the facts of the case, de-
livered the opinion of the court, as follows:

The plaintiff has brought the present suit against the new

---

[*] Paul *v.* Compton, 8 Vesey, Jr., 380; Morice *v.* Durham, 10 Id. 536.

trustees under the mortgage, and the assignees in bankruptcy, to charge the property held by them with the amount of his demand remaining unpaid for work done under his contract with the company. In support of his pretension he insists that under the indenture his contract, when it obtained the assent of two of the trustees, became a charge upon the moneys received by the corporation from the sale of the bonds; that the trustees under the mortgage and the corporation thereupon became trustees for his benefit of the proceeds thus received, and were bound to apply them to pay his debt; that by their failure to have the proceeds thus applied, and by expending them in acquiring new property and improving that already possessed, the charge upon the proceeds became attached to the property in the hands of the trustees thus added to and improved; and that this charge is entitled to preference over the lien of the bondholders.

The positions thus asserted must find their support, if at all, in the provisions of the indenture of mortgage. If not sustained there they are not sustained anywhere. The averments of the bill as to the purport and meaning of the provisions of the indenture, the object of their insertion in the instrument, and the obligations they imposed upon the corporation and the trustees, and the rights they conferred upon the plaintiff when his contract was approved, are not admitted by the demurrer. These are matters of legal inference, conclusions of law upon the construction of the indenture, and are open to contention, a copy of the instrument itself being annexed to the bill, and, therefore, before the court for inspection. A demurrer only admits facts well pleaded; it does not admit matters of inference and argument however clearly stated; it does not admit, for example, the accuracy of an alleged construction of an instrument, when the instrument itself is set forth in the bill, or a copy is annexed, against a construction required by its terms; nor the correctness of the ascription of a purpose to the parties when not justified by the language used. The several averments of the plaintiff in the bill as to his understanding of

his rights, and of the liabilities and duties of others under the contract, can, therefore, exert no influence upon the mind of the court in the disposition of the demurrer. This is not the case of a bill to set aside or reform the contract as not expressing the actual intention of the parties. It is a case where the contention arises solely upon the meaning of the indenture in its bearing upon the contract, and that must be ascertained by applying to its language the ordinary rules of interpretation.*

Looking, then, at the indenture we find that the only clause upon which the plaintiff relies to sustain his positions is the one providing that the expenditure of all sums of money received from the sale of the bonds shall be made with the approval of at least one of the trustees, and that his assent shall be necessary to all contracts made by the corporation " before the same shall be a charge upon any of the sums " thus received. It is contended that the term *charge*, as here used, is synonymous with the term *lien*, and that the whole clause implies that when a contract has thus received the written assent of one of the trustees, it shall be, to the extent of the obligation created, a specific lien upon the moneys obtained. But this meaning of the term is not in harmony with its immediate context, or the object of the indenture. The instrument was executed to secure the payment of the mortgage bonds; it so declares on its face. It nowhere indicates any design to secure the contractors; its language is, " that for the better securing and more sure payment of the sums of money mentioned in the said mortgage bonds, and each of them," the indenture is executed. And the clause in question was intended to increase this security by preventing a wasteful expenditure of the funds of the corporation; it is, in fact, an agreement on its part that the funds received from the bonds shall only be used with the approval of one of the trustees, and without his written assent no contracts shall be payable out of those funds. The term *charge* is not used in any technical sense,

---

* Lea *v.* Robeson, 12 Gray, 280.

as importing a lien upon the funds, but in the general acceptation of a claim that may be payable out of them. The contractors are not parties to the indenture, and are not entitled to claim as against those parties any benefit under its provisions, except that upon the assent being given to their contracts the use of the moneys for their payment is permissible. They are, so far as the agreement is concerned, strangers to the instrument. The written assent to contracts on the part of one of the trustees, was not required for their protection, but as an additional safeguard to the bondholders against an improvident use of the funds by the corporation. The clause is one of a series of covenants on the part of the corporation with the trustees, intended to secure the application of the funds received to the purposes contemplated at the time the indenture was executed,—the retirement of the existing indebtedness of the corporation, the completion of its road, and the laying of a third rail. And full effect is given to the language of the clause in question by this interpretation.

The present case, notwithstanding the largeness of the plaintiff's demand, is not different in its essential features from those cases of daily occurrence, where the expectation of a contractor, that funds of his employer derived from specific sources will be devoted to the payment of his services or materials, is disappointed. Such expectation, however reasonable, founded even upon the express promise of the employer that the funds shall be thus devoted, of itself avails nothing in favor of the contractor. Before there can arise any lien on the funds of the employer, there must be, in addition to such express promise, upon which the contractor relies, some act of appropriation on the part of the employer depriving himself of the control of the funds, and conferring upon the contractor the right to have them applied to his payment when the services are rendered or the materials are furnished. There must be a relinquishment by the employer of the right of dominion over the funds, so that without his aid or consent the contractor can enforce their application to his payment when his contract is com-

pleted.* In the case at bar there is no circumstance impairing the dominion of the corporation over the funds received from the bonds; there is only its covenant with the trustees that the expenditure of those funds shall be made with the approval of one of them, and that one of them shall give his written assent to its contracts before they are paid out of such funds. There is no covenant with the contractor of any kind in the instrument, and no right is conferred upon him to interfere in any disposition which, the corporation may see fit to make of its moneys. The essential elements are wanting in the transaction between him and the corporation to give him any lien upon its funds. No right, therefore, exists in him to pursue such funds into other property upon which they have been expended. The case, as already intimated, is on his part one of simple disappointed expectation, against which misfortune equity furnishes no relief.

The plaintiff made his contract with knowledge of the existing mortgage and of the declaration which it contains, that it is to be the "first and only lien on the property and franchises of the company," and that it covered not only property then held by the company, but would also cover all property which might thereafter be acquired. If he had reason to doubt the future solvency of the corporation, or that it would apply the funds it obtained from its bonds to the payment of his work, he should have provided against such a contingency in advance. He cannot now be heard to complain that his expectation of receiving for his work funds not specifically appropriated for his benefit has failed, and to insist that, therefore, he ought to be allowed to follow those funds into property upon which other parties should have by the terms of a previous contract the first and only lien.

DECREE AFFIRMED.

---

* Rogers v. Hosack, 18 Wendell, 319; Dickenson v. Phillips, 1 Barbour, 454; Hoyt v. Story, 3 Id. 262; Hall v. Jackson, 20 Pickering, 197; Christmas v. Griswold, 8 Ohio, N. S. 558; Christmas v. Russell, 14 Wallace, 70; Malcolm v. Scott, 3 Hare, 46.